IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YELLOW BOOK USA, INC., | ) |
| Plaintiff, | ) Case No. 05 C 04615 |
| v. | ) Judge Virginia M. Kendall |
| AMERICAN PAINTING, INC., and GARY BENS, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff YellowBook USA, Inc. ("Yellow Book" or "Plaintiff") filed suit against Defendants, American Painting Inc. ("American Painting") and Gary Bens ("Defendant" or "Bens") alleging that Defendants breached their guaranty by failing to pay outstanding fees for various ads placed in Plaintiff's directories from 2003 to 2005. Default judgment was entered against American Painting after it failed to appear or answer the Complaint. Defendant Bens defended against the suit by alleging that he should not be held to the guaranty because it only bound the corporation, American Painting, and not him personally. Defendant did not move for summary judgment on the contract and instead both parties sought a bench trial. A bench trial was held to determine whether Bens should be held personally liable for the contracts he signed as corporate officer and/or owner of American Painting. Because the contract clearly indicated that Bens would be held personally liable and because no intrinsic evidence was presented that contradicts that clear language, Bens is responsible personally for the debt.

**Findings of Fact**

Gary Bens is the president and owner of American Painting, an Illinois corporation since 1992. Bens advertised his painting company in the yellow pages of Yellow Book from 2002 through 2006. Yellow Book offered services that included the publication of ads and phone numbers for customers and their companies posted under various headings within the book such as "Painting," the publication of visual ads within the book, and the ability to target various markets by allowing the customer to choose the markets for his ad. Bens chose the configuration of each ad, selected which phone books the ad would appear in, and negotiated the contract with Yellow Book representatives each year. The ads included listings in two parts of the directories and a visual ad that varied in size from year to year or from book to book. Some of these ads were large half-page advertisements.

Bens also paid all the bills for American Painting. Bens gave a deposit for the ads at the time of signing the contract on each occasion by providing Yellow Book with a credit card. The credit card listed both his name and that of his company, American Painting. Bens paid for the ads that he placed in Yellow Book for the first few directories in which his ad ran; but toward the end of 2003, he failed to pay the balance due on the account. Yellow Book continued to run the ads and completed its side of the contract in spite of lack of payment from Bens. Bens also failed to pay for the ad in the 2004 and 2005 books. Bens continued to advertize in Yellow Book in 2006 and began to pay for the ads for that year. As a result, there was an outstanding balance of $97,163.20 due on the American Painting account at Yellow Book for the years 2003-2005. Each of the contracts for each year was signed personally by Bens sometimes accompanied by his title "President" and other times by the title "Owner."

Plaintiff Yellow Book filed suit against Bens and American Painting for failing to pay the overdue amount and sought late charges and attorneys' fees on the balance. American Painting failed to appear or respond to the suit and the Court entered a default judgment against American Painting on January 5, 2006. After receiving the default judgment against American Painting, Yellow Book then sought to recover from Bens personally.

After settlement discussions between the parties failed, both parties agreed to a bench trial regarding the dispute. Yellow Book's position at trial was straightforward: Bens personally guaranteed the corporate debt of his company according to the plain language of the contract and therefore he was personally liable for the entire amount of the overdue balance and attorneys' fees and late charges. Defendant's position was that Bens had signed each of the guarantees for each of the contracts for the ads that he negotiated, but the contracts were confusing and misleading. Defense counsel stated that Bens never had an opportunity to review the reverse side of the contracts and therefore his client could not be bound to a personal guaranty of the contracts.

At trial, two witnesses were called. First, Donna Ambrosio testified as a representative of Yellow Book. Ms. Ambrosio stated that the Yellow Book contract which Mr. Bens signed is a standard contract used within the company for the placing of ads in the various phone books that Yellow Book publishes. These contracts contains spaces for the Yellow Book representative to include the size of the ad, how long the ad will run, the location of the ad, and the directories within which the add will run. This information is obtained from the client and filled in by the Yellow Book Representative. On the front of the contract there are three lines: one which states, "Print Company Name"; one below it which states "Authorized Signature Individually and for the Company (Read clause 14f on reverse side)"; and one below that which states, "Print Signer's Name

/ SS# (required for new accounts and new signer), and "Date." The line which refers to the authorized signature and the reference to Clause 14f is in bold-faced print. On the reverse of the contract, Clause 14f reads: "The signer of this agreement does, by his execution personally and individually undertake and assume the full performance hereof including payments of amounts due hereunder."

Ms. Ambrosio presented the six contracts signed by Mr. Bens for the ads which he placed in Yellow Book which are in dispute; and then presented copies of each of the ads which complied with the contract request and which ran in the requested yellow page directories as ordered by Mr. Bens. Ms. Ambrosio also admitted the business records showing that $97,162.32 was still owed on the account for American Painting and signed by Mr. Bens.

Mr. Bens then testified that he is the president, owner and sole officer of American Painting. He completed high school and three years of college. He stated that he incorporated American Painting in 1992 and believed that is was an S corporation although he admitted later that he knew there were two kinds of corporations, S and C, and he was not sure which type American Painting was. He stated that he and his wife pay the American Painting bills at his kitchen table and that he believes that everything he does with American Painting is done in his corporate capacity. He admitted to having two credit cards – both of which he described as corporate cards – and one of which he uses as a back-up. He does not have any personal credit cards. He stated that he signed each of the contracts for each of the ads after brief sales meetings in his office where the representative filled out the form and then he signed. He was given a copy of each of the contracts after signing and he continued to contract with Yellow Book even after the law suit was filed and continued to sign the contracts for the ads which continued to run. Throughout the four years of the

business relationship, Yellow Book has always complied with its end of the contract by continually placing and running ads pursuant to Bens' directions under the contracts he signed.

Although Bens was aware of the lawsuit against American Painting, he did not hire a lawyer to defend the company and he is aware that a default judgment was entered against the company. He stated that American Painting is currently making money and explained the failure of the company to pay the judgment as something that was not done because settlement discussions regarding the possibility of paying less than the judgment amount were not fruitful.[1] In short, he believed that the judgment was the responsibility of the company of which he is the sole owner, president and officer and that he personally was not liable for the amount.

As for his signature on each of the contracts, Bens stated that would never have knowingly personally guaranteed his contract with Yellow Book because "I don't need to. . . . I'm not on the hook for that." Again, stating his belief that everything he does for American Painting is done "corporately" in order for him to have "some personal protection," Bens stated in sum that he did not intend to bind himself personally for the Yellow Book ads.

At trial, there was a significant dispute regarding the amount due and owing to Yellow Book. The Court credits the testimony of Ms. Ambrosio and the supporting documents that reflect that $119,352.32 is owed on the accounts.

### Personal Guaranties for Corporate Contracts

The parties agree that Illinois law applies to the contract in question. Under Illinois law, if an officer of a corporation signs a guaranty with his corporate affiliation accompanying that

---

[1] His attorney stated during argument that the default judgment against American Painting had not been paid because Plaintiff had yet to file a citation to discover assets.

signature, the officer is not personally bound to the guarantee absent evidence to the contrary. *See Wottowa Ins. Agency v. Bock*, 472 N.E.2d 411, 413 (Ill. App. 1984). In this case, there is evidence that contradicts that the contract is solely a corporate guaranty in the document itself. In bold-faced type directly below the signature line, the contract states that the officer will be individually bound and refers the signatory to the reverse side of the contract where a further section of the contract states that the signatory will be personally bound to the guarantee. When language in the contract conflicts with the general principal that an officer will not normally be bound when he signs a guarantee next to his official title, a genuine issue of fact exists. *Id.* When language in the document conflicts with the apparent representation by the officer's signature, than the trier of fact must determine whether the officer intended to obligate the corporation. *See Knightsbridge Realty Partners, Ltd. V. Pace,* 427 N.E.2d 815 (Ill. App. 1981). When an issue exists as to whether the contract, when construed as a whole, unambiguously reveals an intent to bind only the corporation and the individual, Illinois courts have held that the document is reasonably susceptible to more than one meaning and therefore extrinsic evidence can be considered in determining the intent of the parties. *See MidCity Industrial Supply Company v. Horwitz,* 476 N.E.2d 1271, 1275 (Ill. App. 1985)*.*

At trial, Mr. Bens presented only his personal belief that he should not be bound by the contract because he believes that when he acts in his corporate capacity, he acts as a corporate officer. In order to support this belief, Mr. Bens simply stated his conclusion and did not explain how he circumvented the plain language of the contract which stated that he would be both personally and corporately liable for the guarantee. Three facts were elicited at trial which contradict Mr. Bens' personal conclusion that he should not be personally liable.

6

First, Bens has an opportunity to review the contract and to read the contract. Although the agent for Yellow Book wrote the information on the contract regarding what type of ad, the location of the ad, and the cost of distribution; this was done during an interactive process wherein Bens provided information to the agent, input regarding the copy to be employed, and discussed the placement of the ad in various directories. During this interactive process, the agent for Yellow Book provided the final version of the contract to Mr. Bens for his review. He reviewed the ad contract and was given an opportunity to make any changes prior to signing.

Second, the plain language on the front of the contract beneath the signature line clearly reads that the signatory will be *individually* liable for the contract. This language is not hidden but is rather directly below the signature line in clear view and is in bold-faced type. The plain language also refers to the reverse side of the contract where the signatory is given further information indicating that he will be liable personally for the contract. Bens does not claim that he did not have an opportunity to read that language; nor does he claim that the contract was never given to him. Instead, he asserts simply that, in spite of the language, he should not be held personally liable. Although his attorney stated that evidence would be presented at trial indicating that the contract was confusing or misleading, no evidence was presented to support such a conclusion. In fact, Bens was an articulate witness with three years of college education who stated merely that the period of time during which he met with the YellowBook agent was a short and that the YellowBook agent was the one who filled in the contract. There was no evidence that Bens did not understand what he was doing, that there was an uneven bargaining position, or that Bens was confused about signing the contract. Bens also returned to YellowBook on over six occasions to post his ads which reflects his apparent satisfaction with his dealings with YellowBook and the product they were supplying him.

7

Third, Bens was provided with a copy of the contract at the completion of the negotiation session. In this case, each time that Bens signed one of the six contracts in question he was provided a copy of the contract. This means that over the course of four years, Bens was repeatedly given copies of the same contract with the same personal guaranty language and Bens repeatedly signed the contract with this language.

Finally, under the circumstances presented at trial, it would be reasonable for YellowBook to seek a personal guaranty in addition to the corporate guaranty for those customers, like Bens, who are the sole owners and officers of small companies. Recognizing the difficulty in collecting from small companies which may come and go as market conditions fluctuate, it was not unrealistic that a company like Yellow Book would add standard language to its advertisement contract which binds not only the entity but the officer or owner.

Nothing presented at trial contradicts the plain language of the contract which holds Bens personally and professionally liable for the guarantee. Even after Bens was sued for his unpaid balances, he continued to order ads and continued to pay for those ads after being placed on notice that he was both personally and professionally liable. During those post-dispute contracts, Bens did not attempt to cross out the language of the personal guaranty or add language that limited his guaranty to his corporate role.

Although Illinois law supports the general proposition that a guarantee signed by a corporate officer with his accompanying signature binds solely the corporation, that law is not absolute. When there is other clear evidence to the contrary that indicates that a corporate office is also personally liable for a contract, he may be bound individually. *See e.g. MidCity Industrial Supply Company v. Horwitz,* 476 N.E.2d 1271, 1275 (Ill. App. 1985)(Issue of fact as to whether officer was personally

liable for corporate debt when contract sought personal guaranty beyond corporate signature); *McCracken v. Olson Companies, Inc.,* 500 N.E.2d 487, 493 (Ill. App. Ct. 1986)(Defendant's initial by personal guaranty language sufficient for trial court to conclude that officer intended to bind himself personally.); *84 Lumber Company v. Denni Construction Co., Inc.*, 571 N.E.2d 231, 233 (Ill. App. 1991)(Where language of contract binds officer individually it is unambiguous that officers are personally bound and officer's testimony that their intent was not to be personally bound is irrelevant.). This is one such case.

Because the plain and obvious language of the contract held Bens personally liable for this corporate obligation and because no evidence was presented to contradict that plain language, Bens is liable for the debt both personally and as the officer of his company.

An additional fact worthy of comment was revealed at trial through the testimony of Bens. Although Bens stated unequivocally that he believed he was not personally bound to pay for the YellowBook debt, he stated that his company, American Painting, and he as the corporate officer and owner of American Painting, had not paid the corporate debt. When asked why he had not paid the corporate debt as the corporate officer, Bens replied that he had not been able to negotiate a settlement for a lower amount. His company continues to be lucrative, he is not in bankruptcy, and he continues to place ads for future business in Yellow Book. He simply has refused to pay his bills. Equitably, Bens's position is difficult to reconcile with his alleged good faith belief that he is only corporately liable for his debt. Bens' actions do not reflect his belief that his corporation is liable; but rather, suggest that he simply does not want to pay the debt regardless if it is corporate or personal. He merely wants to continue operating his company, business as usual, without having to deal with his debt to Yellow Book. If Bens had paid his corporate debt, or attempted to do so, it

might have bolstered his position that he believed the debt was solely a corporate one. His actions belie that belief.

## Conclusion

Defendant Bens is liable to Yellow Book personally for $119,352.32.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: February 1, 2007